IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Raymond Humphries *et al.* | : | |
| | : | Case No. C-1-03-810 |
| Plaintiffs | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| Consolidated Grain & Barge Co. | : | PLAINTIFFS' MOTION FOR |
| | : | SUMMARY JUDGMENT, |
| Defendant | : | GRANTING DEFENDANT'S |
| | : | MOTION FOR SUMMARY |
| | : | JUDGMENT ON FEDERAL |
| | : | CLAIMS AND DISMISSING |
| | : | STATE LAW CLAIMS |
| | : | WITHOUT PREJUDICE |

This matter comes before the Court on Defendant Consolidated Grain & Barge Company ("CGB")'s Motion for Summary Judgment on All of Plaintiffs' Claims (doc. #26) and Plaintiffs Raymond and Darlene Humphries' Motion for Partial Summary Judgment (doc. #28). Plaintiffs bring suit under Title VII, found at 42 U.S.C. § 2000 et seq., related state law provisions, and Ohio tort law. For the reasons set forth below, the Humphries' Motion for Partial Summary Judgment is **DENIED**, CGB's Motion for Summary Judgment is **GRANTED** as to the Humphries' federal claims, and the Humphries' state law claims are **DISMISSED WITHOUT PREJUDICE**.

I.   FACTUAL BACKGROUND

Plaintiff Raymond Humphries ("Humphries") is a former employee of CGB, and Plaintiff

1

Darlene Humphries has been his wife for all time relevant to this litigation. Humphries was hired to work at CGB's facility in North Bend, Ohio, in January of 2000. Todd Vollet was the general manager of CGB's North Bend facility who hired and fired Humphries. During the relevant time period, Ed Hill was the superintendent of the facility. (Hill depo. at 17.) During the time that Humphries worked at CGB, there were no female employees in his workplace in the labor yard. (Doc. #30, exs. 7-12.) The evidence indicates that CGB's North Bend yard ran rampant with sexual vulgarity. Many workers referred to each other by nicknames. Humphries was called "Gay Ray." (Jacobs depo. at 21.) Coworker Johnny Jacobs was referred to as "Cocksucker" and sometimes "Slurpy Boy." (Id. at 22-24.) Jacobs testified that after calling him "Slurpy Boy," Humphries instructed him to stay out from under their boss's desk. (Id. at 24.)

In February or March of 2000, Humphries went to Ed Hill to report that his company jacket had "Gay Ray" written on it. (Humphries depo. at 159.) Hill told Humphries that there was nothing he could do about it unless the perpetrator's identity was known. Shortly thereafter, Humphries reported to Vollet that "Gay Ray" and "Ray's a fag" were written on the walls of the facility. Humphries testified that he told Vollet that he thought coworker Jacobs was responsible, but Vollet said that it was Humphries' word against Jacobs' and that nothing could be done until Vollet found out who was responsible. (Humphries depo. at 159-62.) According to Humphries, Vollet told him that he would be separated from Jacobs, but did not follow through. In May of 2000, Humphries discovered pictures of nude men posted in his work area. (Id. at 169.) In April of 2002, Humphries found a wooden sign reading "Gay Ray's Shop" in his work area. (Id. at 191.)

In July of 2002, Humphries reported to his supervisors that a nude playing card had been attached to his time card. He also informed them that such things particularly bothered him as a result of suffering sexual abuse as a child. (Id. at 166-67.) This report prompted a training session on sexual harassment for CGB employees shortly thereafter. Humphries testified that in addition to the playing card incident of July 2002 and the incidents in 2000, there was graffiti at the facility that said "Gay Ray," and "Rick and Ray are fags." (Id. at 172.) A fellow CGB employee once told Humphries when Humphries was drinking milk that a dribble of milk on his lip gave the other man "a hard-on." (Id. at 177.) Humphries also once found a gay personal ad taped to his time card and reported the incident to his supervisor. (Id. at 178.)

After the training session in the summer of 2002, Humphries again found a nude playing card attached to his time card. He again reported it to his supervisor. (Id. at 197-98.) As a result of this incident, all employees at Humphries' workplace were suspended save for Humphries and the managerial staff. (Id. at 199.) Humphries experienced significant difficulty communicating with his coworkers during this time. (Id. at 203.) He approached management to eliminate the suspensions and was told that signing a release would lift the suspensions. He declined and informed CGB that he would be seeking legal counsel. (Id. at ex. 22.)

In February of 2003, Humprhies suffered a work-related elbow injury and was put on light-duty. (Id. at 205.) He informed his supervisor, Dale Hoffman, that he couldn't perform the work assigned to him. (Id. at 206.) Hoffman promised to send someone out to help him, but Humphries ended up performing the work himself. (Id.) Humphries also testified that he never complained to his superiors about his job duties violating his restrictions. (Id. at 210.) In April of 2003, Humphries filed a charge of sex harassment with the Equal Employment Opportunity

Commission ("EEO charge") .  In late summer of 2003, Humphries discovered two clipboards in his work area that had words like "Ray's gay," and "cocksucker" on them.  (Id. at 214-15.)  That summer, Humphries filed a second EEO charge, alleging retaliation in response to being given less favorable employment duties than similarly situated workers.  (Id. at 224, ex. 25.)

On October 22, 2003, Humphries was running an operating belt when it started smoking.  He and Hoffman got into an altercation about the incident, during which time Humphries ended up grabbing Hoffman by his coat under the neck.  Humphries testified that he felt that he was going to pass out and he reached out and grabbed Hoffman as he fell.  (Id. at 280.)  Hoffman testified by affidavit that Humphries grabbed him under the neck and shook him and that he believed Humphries intended to physically harm him.  (Doc. #26, ex. 14 Hoffman affidavit.)  According to CGB, Humphries was terminated the next day for his physical and threatening attack on his supervisor.  (Id.)  Humphries testified that as a result of these events, he has been unable to enjoy sexual activity with his wife.  (Ray depo. at 268.)

**II.      LEGAL STANDARD**

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56©.  On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat

a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

### III.  ANALYSIS

#### A.  Title VII – Hostile Work Environment

Humphries asserts that CGB violated Title VII by maintaining a work environment that was hostile to him because of his sex.

To establish that sex discrimination created a hostile or abusive work environment, Humphries must show that (1) he is a member of a protected class; (2) he was subject to unwelcomed sexual harassment; (3) the harassment was based on Humphries' sex; (4) the harassment created a hostile work environment; and (5) CGB failed to take reasonable care to prevent and correct any sexually harassing behavior. See Williams v. Gen. Motors Corp., 187 F.3d 553, 560-61 (6th Cir.1999). "[T]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether – taken together – the reported incidents make out such a case." Id. Unless extremely serious, isolated incidents of harassment will not amount to discriminatory changes in the terms or conditions of employment actionable under Title VII. See Morris v. Oldham County Fiscal Court, 201 F.3d 784, 790 (6th Cir. 2000).

CGB argues that Humphries cannot show any harassment based on his sex. The Supreme

Court held in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998), that Title VII prohibits discrimination based on sex which alters the terms and conditions of the workplace, notwithstanding whether such discrimination takes the form of opposite-sex sexual harassment or same-sex sexual harassment. Oncale, 523 U.S. at 80-82. The Supreme Court made clear, however, that in order for the conduct to fall within the purview of Title VII, the harassing conduct must be on the basis of sex and pervasive and severe enough to alter the conditions of the workplace. Id. at 81 ("[w]e have always regarded that requirement as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace – such as male-on-male horseplay . . . – for discriminatory 'conditions of employment.'")

In Oncale, the Supreme Court outlined three different evidentiary routes by which a plaintiff could show same-sex sexual harassment. First, Humphries could show that explicit or implicit proposals of sexual activity were made by a harasser motivated by sexual desire. Second, Humphries could show that the harassing conduct stemmed from a general hostility to the presence of men in his workplace. Third, Humphries could offer direct comparative evidence of how the harasser or harassers treated men versus women in a mixed sex workplace. Id. at 80-81. Whichever evidentiary route pursued, however, "he . . . must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of sex.'" Id. at 81 (emphasis in the original).

The question central to Humphries' hostile work environment claim, therefore, is whether he can prove that harassment occurred because of his sex. Humphries has produced no evidence that any of the conduct described above was motivated by any sexual desire. He has not produced evidence of any sex-specific and derogatory terms by another man which show general

hostility toward other men in the workplace. He can offer no direct comparative evidence of differential treatment of the sexes in his workplace because the labor yard is populated only by men. (Doc. #30, exs. 7-12.)

Although the three evidentiary routes outlined in Oncale may not be exhaustive, Humphries has not developed any other theories that support an inference of discrimination based on his sex. Humphries relies on Doe by Doe v. City of Belville, 119 F.3d 563, 581 (7th Cir. 1997), vacated in light of Oncale in City of Belville v. Doe by Doe, 523 U.S. 1001 (1998), for the premise that he was clearly harassed because of his sex due to the overtly sexual nature of the repeated taunts and gestures that he suffered. He points to the multiple pictures of nude males found in his work area and on his time card, the name calling alleging that he is gay, his coworkers referring to him as cocksucker, a coworker comment regarding arousal when Humphries was drinking milk, and the appearance of a gay personal ad in his work area. Doe's theory that harassment consisting of sexually explicit conduct constitutes discrimination based on sex, however, was vacated in light of Oncale, which set forth the three evidentiary routes as examples of how same-sex claims of discrimination based on sex could be demonstrated. The Sixth Circuit has warned of conflating distaste for vulgarity with prohibition of sex discrimination: "[s]ince the conduct complained of in many of these sexual harassment cases is so offensive, it is easy to understand that a sense of decency initially inclines one to want to grant relief. It is easy to forget, however, that Title VII deals with discrimination in the workplace, not morality or vulgarity." Equal Employment Opportunity Comm. v. Harbert-Yeargin, Inc., 266 F.3d 498, 519 (6th Cir. 2001).

The Sixth Circuit has held that explicitly sexual conduct is not, standing alone, sufficient

7

to constitute sexual harassment. In <u>King v. Super Service, Inc.</u>, No. 01-6143, 2003 WL 21500008, *1 (6th Cir. June 26, 2003), plaintiff King was subjected to name calling consisting of derogatory terms for being gay, repeated assertions from coworkers that King wanted to perform oral sex on them, and some related physical abuse. The Sixth Circuit upheld the district court's grant of summary judgment in favor of King's employer because King had made no showing that the harassing conduct was motivated by sexual desire, that other male employees were harassed in sex-specific and derogatory terms that made clear that the harasser was motivated by a general hostility to other men in the workplace, or that men were treated comparatively worse than women in the workplace. <u>Id.</u> at *3-*5.

     Humphries attempts to distinguish the facts of this case from those of <u>King</u> by stating that in <u>King</u> "there is no evidence of nude pictures, work equipment with engravings, acknowledgment by management of conduct by coworkers, etc." (Doc. #33 at 12.) In fact, in <u>King</u>, plaintiff King did report the harassing conduct to his supervisor, who did threaten discipline and issue memos requesting the behavior to cease. <u>King</u>, 2003 WL 21500008, at *1. This Court finds the reasoning in <u>King</u> to be sound, and further finds the facts of this case to be materially indistinguishable from those in <u>King</u>. The Sixth Circuit did not uphold the grant of summary judgment to King's employer because the conduct was not pervasive or not sufficiently sexually explicit – it upheld summary judgment because there was no evidence that the harassing conduct was because of King's sex. Likewise, whether Humphries' harassers engaged in verbally or visually graphic harassing conduct, Humphries has not produced any evidence that the harassing conduct was based on his sex or because of his gender in the manner outlined in <u>Oncale</u> and reinforced in <u>Harbert-Yeargin</u>.

8

The Sixth Circuit noted that while remarks or insults based on sex-stereotyping do not inevitably prove gender discrimination, they may prove gender discrimination when the plaintiff shows that the employer actually relied on the plaintiff's gender in making the adverse employment decision. Id. at *4 (quoting Spearman v. Ford Motor Co., 231 F.3d 1080, 1085 (7th Cir. 2000). Humphries has produced no evidence that his coworkers taunted him because they actually thought he was gay or thought that he did not comport with gender stereotypes, nor has he shown that CGB relied on these perceptions in taking any actions against him. The conduct of workers at CGB's yard is vile and should not be tolerated in a civilized workplace, but the harassment does not fall within the ambit of Title VII's prohibited behavior, and CGB's motion for summary judgment on Humphries' hostile work environment claim must therefore be **GRANTED**.

    B.    Retaliation

Humphries also moves for summary judgment on his retaliation claim. To establish a prima facie case of retaliation, Humphries must show that 1) he engaged in protected activity, 2) CGB knew he had engaged in protected activity, 3) thereafter, CGB took adverse employment action against him, and 4) a causal connection exists between the protected activity and adverse employment action. Morris, 201 F.3d at 792. If Humphries satisfies this burden, the burden of production then shifts to CGB to articulate a legitimate, non-retaliatory reason for the employment action. If CGB does so, the burden of production shifts back to Humphries to show that the proffered explanations are merely pretext for retaliation. Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563-64 (6th Cir. 2004). Humphries can show that the proffered reason is pretextual by showing that it 1) had no basis in fact, 2) did not actually motivate CGB's

9

challenged conduct, or 3) was insufficient to warrant the challenged conduct.  Singfield, 389 F.3d at 564 (quoting Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).

Humphries engaged in protected activity when he filed his EEO charge, and CGB knew that he had engaged in protected activity.  Humphries puts forward three theories by which he seeks to show that CGB took adverse employment against him.  First, that after his EEO charge he was assigned heavy work despite a doctor's order that he be on light duty and was given less favorable duties; second, that CGB failed to act when he complained about coworkers ignoring him and posing a safety risk in his work; and third, that CGB fired him once it received notice that the EEOC would not pursue his claims.

First, regarding Humphries' allegation that after his EEO charge he was assigned heavy work despite being placed on light duty, Humphries points to a list that he recorded of duties that he performed that violated his work restrictions.  (Humphries depo. ex. 21.)  These tasks span from between May and July of 2003.  Medical records indicate, however, that Humphries was on light-duty restriction only between February and April of 2003.  (See Humphries depo. exs. 35 and 36.)  While Humphries testified that he could not perform all his work, there is no evidence that this occurred while he was on light duty or that he ever complained about these job duties.  (Humphries depo. at 210.)  Humphries therefore has produced no evidence that he was assigned heavy work despite being placed on light duty.  Regarding his allegation that after filing his EEO charge he was given less favorable duties than similarly situated employees like washing pits and cleaning rails, he testified that other yard workers at CGB also washed pits and cleaned rails. (Id. at 109-110.)  The Court finds that these allegations do not constitute an adverse employment action.

Second, Humphries appears to argue that when CGB disciplined Humphries' coworkers after Humphries lodged a complaint, the resulting social isolation by Humphries' coworkers constituted retaliation in violation of Title VII. Humphries points to no case law or legal authority for this proposition. It is certainly true that the suspensions placed Humphries in a difficult and unenviable social position. CGB, however, was also in the unenviable position of attempting to respond to Humphries' complaints about coworker harassment without knowing who was responsible for the unacceptable behavior. To have imposed no discipline, CGB would have been unresponsive to Humphries' needs. CGB having imposed suspensions, Humphries now argues that their response was retaliatory. Without any evidence that the social ostracism of Humphries by his coworkers post-suspension was in any way directed or orchestrated by CGB, Humphries' claim that coworkers ignored or ostracized him cannot constitute an adverse employment action.[1]

Finally, even if Humphries can establish a prima facie case of retaliation regarding his termination from CGB, CGB has articulated a legitimate, non-retaliatory reason for his discharge. CGB points to the incident between Humphries and supervisor Dale Hoffman in late October of 2003. Hoffman testified by affidavit that after Humphries had difficulty with an operating belt and Hoffman informed him he had hit the wrong button, Humphries became agitated and began speaking to Hoffman with increasing volume until Humphries grabbed him

---

[1]Humphries also argues that CGB should have separated him from Jacobs after Humphries told Vollet that he thought Jacobs was responsible for some of the harassing conduct. While separation would no doubt have been the appropriate course of action, Humphries certainly does not carry his burden to demonstrate in any way how the failure to separate constitutes an adverse employment action or how such failure is causally connected to his EEO charge filed three years after Humphries spoke with Vollet.

by the coat around the neck.  (Doc. #26, ex. 14 Hoffman affidavit.)  Hoffman testified that Humphries was so angry that he was shaking.  (Id.)

In order to counter this explanation, Humphries must demonstrate that it is pretextual and the real reason for his termination is retaliation.  He cannot show that the Hoffman incident has no basis in fact, since he admits that it happened but explained that he felt faint and fell on Hoffman.  (Humphries depo. at 280.)  Humphries attempts to show that his altercation with Hoffman did not actually motivate his termination by pointing to Todd Vollet's testimony that he took Humphries' story and Hoffman's story, but that Humphries' credibility "was shrinking anyway," so unless Humphries had something unusual to say, Vollet would back Hoffman.  (Vollet depo. at 87.)  Humphries argues that this comment about his credibility shows that his termination was based not on the incident with Hoffman but on Vollet's "personal feelings about Ray."  (Doc. #33 at 15.)  Vollet explains in his deposition that he regarded Humphries' credibility to be shrinking because Humphries "would never admit that he did something wrong. . . It was never Ray's fault.  Ray had a temper that was – would directly coincide with the incident.  I seen Ray blow up more than once."  (Vollet depo. at 88.)  Vollet's explanation that he would credit Hoffman's account over Humphries' given Humphries' history of temperamental outbursts does not constitute a showing of pretext that Humphries' altercation with Hoffman did not actually motivate his termination.  Likewise, Humphries has produced no evidence or argument to suggest that his altercation with Hoffman was insufficient to warrant his termination.  Since CGB has articulated a legitimate, non-retaliatory reason for Humphries' termination and Humphries has not shown that such reason is pretextual, Humphries' motion for summary judgment on his retaliation claim must be **DENIED**, and CGB's motion for summary

judgment on this claim is **GRANTED**.

      **C.**      **State Law Claims**

Humphries also brings state law claims of wrongful discharge and intentional infliction of emotional distress. His wife, Darlene Humphries, brings a state law loss of consortium claim. "It has long been understood that if the federal claims that are the basis for jurisdiction are eliminated from the case, the federal court has discretion whether to exercise pendent jurisdiction over the remaining state-law claims or to decline to exercise that jurisdiction." 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3567.1 (Supp. 2004); see also United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). Having dismissed Humphries' federal claims, this Court declines to exercise jurisdiction over and **DISMISSES WITHOUT PREJUDICE** Raymond and Darlene Humphries' supplemental state law wrongful discharge, intentional infliction of emotional distress, and loss of consortium claims.

**IV.**    **CONCLUSION**

For the foregoing reasons, this Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment (doc. #28) and **GRANTS** Defendant CGB's Motion for Summary Judgment (doc. #26) as to Humphries' hostile work environment, sex harassment, and retaliation claims and **DENIES** Defendant's Motion as to Raymond and Darlene Humphries' supplemental state law wrongful discharge, intentional infliction of emotional distress, and loss of consortium claims, which are **DISMISSED WITHOUT PREJUDICE** .

      IT IS SO ORDERED.

                                                  \_\_\_s/Susan J. Dlott_____
                                                  Susan J. Dlott
                                                  United States District Judge